CHRYSLER CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72055. Filed February 9, 1960.

844

*John J. Costello, Esq.*, for the petitioner.

*Walter T. Hart, Esq.*, and *Robert W. Siegel, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent has determined a deficiency of $457,650.62 in the petitioner's income tax for 1951. The primary issue presented is the correctness of the respondent's action in determining that for the taxable year in question the petitioner was not entitled to any deduction with respect to insurance on the lives of its retired employees, other than the amount of premiums accrued during the year on such insurance, and in accordingly disallowing a deduction of $566,750 taken by the petitioner as the cost of free life insurance with respect to its retired employees.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner is a Delaware corporation with its principal office in Highland Park, Detroit, Michigan. It timely filed its Federal income tax return for 1951 with the collector of internal revenue for the district of Michigan.

At all times material herein, the petitioner kept its regular books of account and filed its Federal income tax returns on a calendar year basis, employing an accrual method of accounting.

Pursuant to an application executed by petitioner in April 1929, Aetna Life Insurance Company, Hartford, Connecticut, issued to petitioner group policy No. 4465, dated May 1, 1929, providing life insurance with respect to all of the petitioner's active employees who agreed to make a required contribution toward the cost of the insurance. The policy was for a 1-year renewable term, nonparticipating, and contained a provision for the payment of a permanent total disability benefit. Although the policy continued in effect from May 1929 until in 1950, during which period it was altered by various riders attached to it from time to time, it did not, except for certain conversion provisions therein, contain any provision for life insurance for petitioner's employees after their retirement. Nor had provisions for life insurance for retired employees been contained in petitioner's agreements with labor unions or in any other policies issued by Aetna to petitioner.

During 1950 the petitioner entered into collective bargaining agreements with International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (U.A.W.-C.I.O.), and various local and other unions, sometimes hereinafter collectively referred to as the union. The basic union agreement was executed on May 4, 1950, and sometimes hereinafter is referred to as the union agreement.

The union agreement provided that it should continue in full force and effect until May 4, 1953, and thereafter from year to year unless within specified periods one of the parties notified the other of its desire to terminate the agreement. An amendment dated December 11, 1950, to the union agreement provided that the agreement should continue in full force and effect until August 31, 1955, and thereafter from year to year unless within stated periods one of the parties notified the other of its desire to terminate the agreement.

The petitioner's pension program, sometimes hereinafter referred to as the pension plan, was the pension provisions incorporated into the union agreement as article IX of that agreement.

Article X of the union agreement related to "Insurances"—life, sickness, and accident, Blue Cross (hospital expense), and Blue Shield (surgical-medical expense)—and contained the following provisions respecting life insurance:

Section 1. The Corporation [petitioner] now has in effect with Aetna Life Insurance Company, Hartford, Connecticut, a group life policy containing permanent total disability provision. During the period of this agreement after the effective date of this Article X, the Corporation will renew said policy or continue it in effect, or will obtain from Aetna Life Insurance Company or another insurance company or insurance companies of comparable standing to Aetna Life Insurance Company a policy or policies, or a rider to said policy, as hereinafter set forth. Aetna Life Insurance Company or such other insurance company or companies are referred to below as the Insurance Company.

(a) The Corporation has submitted to the Union the form of a rider to the present life policy, or of a new life policy, hereinafter called in either case the Life Policy, which includes among other things (i) provision for making available to employees life insurance in the amount of $3,600; (ii) free life insurance for life in the amount of $1,000 for insured employees upon retiring under Article IX of this agreement and during the term of this agreement with twenty-five years' credited service, $750 upon retiring under said Article IX during such term with less than twenty-five but not less than twenty years' credited service and $500 upon retiring under said Article IX during such term with less than twenty but not less than fifteen[1] years' credited service; (iii) payment of permanent total disability benefits to insured employees for disabilities * * *. The parties have caused the form of the Life Policy to be signed and approved by a representative of each party. The Corporation agrees that it will arrange with the Insurance Company, subject however to the approval of the Michigan Insurance Department and the approval, if necessary, of the Insurance Department or corresponding authority of any other State, to issue a Life Policy embodying in substance the terms of the above mentioned form of Life Policy. Said policy or rider, when issued in substantially the form in which the parties have approved it, shall be determinative of the rights and obligations under this Article X, of employees, retired employees (as defined in Article IX of this agreement) the Union, and the Corporation.

(b) The Corporation will change the rate of the contribution of employees to the premiums for the Life Policy from the present rate of 60¢ per month per $1,000. of insurance to 45¢ per month per $1,000. of insurance.

*     *     *     *     *     *     *

Section 3. (a) The Corporation will pay any increase of premium required on the Life Policy * * * during the term of this Article and shall receive and retain any dividends paid or credits, refunds or reimbursements under whatever name, made on the Life Policy * * *

(b) The Corporation shall deduct from the pay of each insured employee the amounts of his contributions under this Article X. Each employee shall furnish to the Corporation any written authorizations or appointments as shall be necessary to authorize the Corporation to deduct from his pay the amount of his contributions. Where deductions cannot be made from earnings

---

[1] This number was reduced to 10 by amendment dated December 11, 1950, to the union agreement.

of an employee for payment of his contributions, he shall pay his contributions to the Corporation in cash at or before the regular time for making his deductions.

\* \* \* \* \* \* \*

Section 5. This Article X is contingent upon and subject to obtaining such approval as may be necessary from any state department of insurance or from any similar or other official body of the Life Policy \* \* \* and the benefits provided, and proposed to be provided \* \* \*. If the Insurance Company shall refuse, or be unable to modify or issue the Life Policy \* \* \* so as to contain any one or more of the provisions referred to above in this Article X, no employee shall have any right or benefit that he would have had under the Life Policy \* \* \* if it had contained such provision or provisions. If, for any reason not due to the fault of the Corporation, the Insurance Company shall terminate or refuse to renew the Life Policy \* \* \* the Corporation shall apply to another insurance company or other insurance companies for a group life policy \* \* \* on terms as similar to the terms of the Life Policy \* \* \* as the Corporation is reasonably able to obtain.

Section 6. The Corporation shall be under no obligation by reason of this Article X except in good faith to endeavor to obtain the insurance herein described, and to pay its share of the premiums thereunder and to fulfill any obligations it undertakes in said policies.

The recital contained in article X, section 1(a) of the union agreement, that "[t]he Corporation has submitted to the Union the form of a rider to the present life policy, or of a new life policy, hereinafter called in either case the Life Policy," referred to two possible alternative methods of putting into effect the provisions with respect to life insurance coverage for petitioner's employees (both active employees and those insured employees who retire during the life of the union agreement with the specified years of service) contained in the union agreement, namely, the use of a rider to the then existing "present life policy" (group policy No. 4465) or, alternatively, the use of a form of "a new life policy." The latter provision was adopted and the term "the form of a rider to the present life policy, or of a new life policy" was in fact a draft of a new life policy, which was subsequently issued, being group policy No. 40,400 executed by Aetna as of July 25, 1950, to take effect August 1, 1950, and referred to more fully hereinafter.

Following execution of the union agreement on May 4, 1950, and the amendment thereof on December 11, 1950, the petitioner extended pension and insurance benefits to all nonunion employees comparable to those benefits provided for its union employees under the union agreement.

Group policy No. 40,400, described on its face as a 1-year renewable term, nonparticipating policy, with a permanent total disability provision, was, in all respects material herein, "issued in substantially the form in which the parties [to the union agreement] \* \* \* [had] approved it." Subsequently riders GR-4633

and 4591, executed by Aetna as of May 22, 1951, and July 6, 1951, respectively, and relating to employees retiring on and after March 1, 1951, were attached to the policy. Group policy No. 40,400 with the foregoing riders is sometimes hereinafter referred to as the policy.

The policy provides that:

The Insurance Company [Aetna] HEREBY AGREES TO PAY, to a beneficiary determined in accordance with the terms of this policy, an amount determined in accordance with the terms of this policy, IMMEDIATELY, upon receipt of due proof of the death, while insured hereunder, of any employee of the Employer [petitioner].

The policy also recites that it was issued in consideration of the payment by the petitioner of premiums in advance to Aetna or its authorized agent; that the first premium should be payable as of August 1, 1950, to cover the period beginning on that date and ending on August 31, 1950; that subsequent premiums should be payable on the first day of each calendar month; that the period beginning August 1, 1950, and ending July 31, 1951, should be considered the first policy year; that each policy year thereafter should commence on the first day of August; and that insurance of an employee of petitioner under the policy replaces and supersedes the employee's insurance, if any, under group policy No. 4465.

Group policy No. 40,400 provided that unless otherwise provided therein the amount of insurance for each employee should be determined as follows:

*Classification*
Salaried employees as follows:

| *Monthly rate of basic earnings* | *Amount of insurance* |
|---|---|
| Less than $350.00 | $3,600 |
| $350.00 or more but less than $450.00 | 4,000 |
| $450.00 or more but less than $550.00 | 5,000 |
| $550.00 or more but less than $650.00 | 7,500 |
| $650.00 or more | 10,000 |
| Hourly rated employees | 3,600 |

The policy contained the following provisions:

If an employee retires pursuant to the pension plan of the Employer and is entitled to a pension under said plan, and if such retirement occurs on or after August 1, 1950 and during the continuance of premium payments for the employee's insurance under this policy, the amount of insurance for the employee shall, from and after the date of such retirement, be limited to the amount of $500 in the case of an employee who at the date of such retirement has at least fifteen[2] but less than twenty years of credited service with the Employer, to the amount of $750 in the case of an employee who at the date of such retirement has at least twenty but less than twenty-five years of credited service with the Employer, and to the amount of $1,000 in the case

---

[2] By riders GR–4633 and 4951 this number was reduced to 10 with respect to employees retiring on and after March 1, 1951.

of an employee who at the date of such retirement has at least twenty-five years of credited service with the Employer. An employee whose insurance is so limited shall not be required to contribute toward the cost of his insurance under this policy in respect of any period on and after the date of such retirement. Credited service, for the purposes of this policy, shall be determined in accordance with the rules used by the Employer for pension purposes. Except as provided in this paragraph, no one shall remain insured under this policy after retirement from the employ of the Employer; * * *

An employee whose insurance is reduced to conform to the terms of the next preceding paragraph shall be entitled to the "Conversion Privilege" set forth in this policy as though employment had terminated as of the date such reduction takes effect, except that the amount of insurance to be converted shall not exceed the amount of such reduction.

### EMPLOYEE CONTRIBUTIONS

The Employer agrees that no insured employee will be required or permitted to contribute more than 45¢ per month per $1,000 of his insurance under this policy.

\*     \*     \*     \*     \*     \*     \*

### PREMIUM CALCULATIONS

At the beginning of each policy year the Insurance Company shall compute an aggregate monthly premium which shall be the sum of the individual premiums for the employees then insured, calculated according to the table of premium rates then in effect hereunder on the basis of the ages (nearest birthday) then attained by the insured employees and their respective amounts of insurance. From such computation an average premium rate shall be determined by dividing the aggregate premium by the aggregate amount of insurance then in force, and such average premium rate shall remain in effect, and shall be used in calculating all premiums under this policy, until a new one is determined. Each premium due during the policy year shall be calculated by multiplying the amount of insurance in force at the beginning of the premium-paying period by the average premium rate in effect on the premium-due date.

Any insurance becoming effective shall be charged for from the first day of the policy month coinciding with or next following the date the insurance takes effect. Premium charges for any insurance terminated shall cease as of the first day of the policy month coinciding with or next following the date the insurance terminates. If premiums are payable quarterly, semi-annually, or annually, premium charges or credits for a fraction of a premium-paying period required by the foregoing terms of this paragraph shall be made on a pro-rata basis for the number of policy months between the date premium charges commence or cease and the end of the premium-paying period.

Instead of the method of calculation of premiums above provided, premiums may be calculated by any method which produces approximately the same total amount of premiums and is mutually agreeable to the Insurance Company and the Employer.

### EXPERIENCE RATING

This policy shall not be entitled to share in the surplus earnings of the Insurance Company.

The following table of premium rates shall be used in calculating premiums under this policy, subject to such experience reductions or increases as the Insurance Company may make under its experience rating plan in effect at the

time of the respective changes in premium rates. Each experience reduction or increase in any premium rate shall be made by written notification to the Employer by the Insurance Company. No experience increase in premium rates shall become effective less than twelve months after the effective date of any previous experience increase in premium rates.

At the end of each policy year, the Insurance Company shall allow to the Employer an experience credit, in such amount, if any, as shall be determined by the experience rating plan which the Insurance Company then has in effect. The amount of each such experience credit shall be paid in cash to the Employer, or upon request by the Employer, a part or all of the experience credit shall be applied against the payment of any premium or premiums.

If the aggregate of employee contributions made under this policy in respect of any one policy year shall exceed the aggregate of premiums paid under this policy in respect of the same policy year (after giving effect to any experience credits allowed in respect of such policy year), such excess—less the amount obtained by deducting the aggregate of employee contributions made under this policy in respect of the two policy years preceding such policy year from the aggregate of premiums paid (after giving effect to any experience credits) under this policy in respect of the same two policy years—shall be applied by the Employer for the sole benefit of employees; but the Insurance Company shall not be obliged to see to the application of any such excess.

Immediately following the foregoing the policy contained a table of monthly premium rates per $1,000 of insurance which ranged from 47 cents per month per $1,000 of insurance for a person aged 16 to $34.55 per month per $1,000 of insurance for a person aged 95.

Respecting its cancellation or discontinuance by Aetna the policy contained the following provision:

The Insurance Company reserves the right to discontinue this policy on any premium due date when less than seventy-five per cent. of the eligible employees are insured hereunder, provided that the Insurance Company shall give the Employer at least thirty-one days' notice of its intent to discontinue.

The Insurance Company hereby agrees that at no time will it, without the consent of the Employer, cancel or otherwise lapse or discontinue this policy, unless (i) the Employer shall fail to make a timely payment of any premium provided for by the terms of this policy, or (ii) the Employer shall refuse, without good and sufficient cause, to duly perform in good faith any one or more of its other obligations under this policy, or (iii) less than seventy-five per cent. of the eligible employees are insured under this policy. Any premium payable under this policy shall be deemed to have been paid timely if it is paid by the Employer to the Insurance Company before the expiration of thirty-one days after the date on which such premium became payable by the terms of this policy.

The policy also provided that Aetna would issue to the petitioner for delivery to each insured employee a certificate containing a statement as to the insurance protection to which the employee was entitled and to whom it was payable, together with a statement of the conversion privilege contained in the policy. The policy further provided that it might be changed at any time or times by written agreement between Aetna and the petitioner, but if such change adversely affected any rights described in the

certificates issued thereunder, new certificates or certificate riders showing the change would be issued to petitioner for delivery to each insured employee. In addition the policy provided that neither the employees nor their beneficiaries might assign the insurance or other benefits under the policy and that, except so far as might be contrary to the laws of any State having jurisdiction in the premises, the insurance and other benefits under the policy should be exempt from legal or equitable process for the debts or liabilities of the employees or their beneficiaries.

In accordance with the policy, Aetna, upon the retirement of each employee of the petitioner who retired pursuant to the pension plan of the petitioner and who was insured under the policy, has issued to such retired employee a certificate, stating the amount of life insurance to which he was entitled thereunder so long as the policy remained in force, namely, $1,000, $750, or $500, depending on whether the length of his service was 25, 20, or 10 years, respectively.

Since the policy has been in effect, petitioner, in accordance with prior established practice, has at all times made payments (estimated and final) in accordance with Aetna's experience rating plan referred to in the policy and has at no time made payments pursuant to the table of premium rates contained in the policy.

Under Aetna's experience rating plan, Aetna, at the beginning of a policy year, determined an estimated necessary premium based on Aetna's experience during the preceding policy year. The estimated necessary premium was divided into monthly premiums which were paid by petitioner to Aetna. At the end of the policy year (July 31), Aetna determined the necessary premium due under the policy. The necessary premium then determined consisted of the claims incurred by Aetna upon the death of active and retired employees covered by the policy, the cost to petitioner for conversion privileges exercised by employees, and Aetna's charge, sometimes hereinafter referred to as retention, for services it had rendered.

After Aetna has determined the necessary premium for the policy year, the difference, in the event of a surplus, between the necessary premium and the total monthly amounts (estimated necessary premiums) paid to Aetna by petitioner is either refunded to the petitioner or applied in payment of other insurance coverage obtained from Aetna. Where there is a deficit, it is charged to a memorandum account which Aetna maintained (representing amounts which petitioner had paid Aetna in prior years under an earlier policy and from which Aetna had been recovering deficits) or carried forward and charged against any surplus in subsequent years resulting under the experience rating plan.

During the period August 1, 1950, the effective date of the policy, through December 31, 1951, 672 employees of petitioner still living on the latter date and who were insured under the policy, retired. The total face amount of life insurance coverage under the policy for these employees as reflected by the certificates issued to them upon their retirement was $566,750. Of the foregoing employees, 290 retired during the period August 1 through December 31, 1950, and the total amount of their life insurance coverage under the policy after their retirement was $255,000. The remainder of the employees, 382, retired during 1951 and the total amount of their life insurance coverage under the policy after their retirement was $311,750. On December 31, 1951, the average age of the 672 employees was 69.7 years, the age of the youngest being 55 and that of the oldest being 86.

There were 48 of petitioner's employees covered by insurance under the policy who retired during the period August 1, 1950, through December 31, 1951, and who died during that period. The total of death claims with respect to their deaths was $42,250.

For the policy year ended July 31, 1952, incurred claims under the policy amounted to $2,192,904; the cost of group life conversions for those insured under the policy amounted to $20,404; and the service charge or retention amounted to $142,766.

During December 1951 the petitioner set up on its books an account entitled "Outstanding Liability for Free Life Insurance on Retired Employees" with a net credit of $566,750, which amount corresponded with the total face amount of life insurance coverage under the policy as of December 31, 1951, on the employees, still living, who retired during the period August 1, 1950, through December 31, 1951, as reflected in the certificates issued to such retired employees. A like amount, $566,750, was debited to expense on petitioner's books and taken as a deduction on petitioner's income tax return for 1951. In determining the deficiency involved herein the respondent determined that no deduction was allowable to petitioner for insurance on the lives of retired employees other than the amount of premiums accrued during the taxable year 1951. Having allowed as a deduction the premiums billed by Aetna to petitioner for the year with respect to the policy, the respondent disallowed the deduction of $566,750 taken by petitioner.

At all times since December 31, 1951, periodic or monthly entries have been made to the Outstanding Liability for Free Life Insurance on Retired Employees account to reflect the face amount of coverage under the policy as shown on the certificates issued to retired employees who retired under the petitioner's pension plan during the respective periods or months. These entries increase the credit balance carried in the account and a corresponding amount

is taken by petitioner as a deduction in its income tax return for the taxable year in which the entries are made. At all times since December 31, 1951, periodic or monthly entries have been made in the account to reflect the face amount of death claims paid by Aetna to beneficiaries of insured retired employees who died during the preceding month or period. These entries reduce the balance in the account but are neither charged to expense nor claimed as a deduction on the petitioner's income tax return for the taxable year in which Aetna paid the insured's beneficiaries.

Petitioner decided that, in order to defray the anticipated costs of life insurance in the amounts as limited by the policy for its employees (both union and nonunion) upon their retirement and without further contribution by the employees after retirement, there should be a provision out of current income as of December 31, 1951, in the amount of $1,457,266. The retirees considered were both those former employees who retired during the period August 1, 1950, through December 31, 1951, and were still living on the latter date and those active employees who had not yet retired at December 31, 1951. Accordingly, on December 31, 1951, petitioner set up on its books an account entitled "Accrued Provision for Free Life Insurance." After an adjustment of $445,258 for Federal income tax consequences, petitioner entered an amount of $1,012,008 on its books as a debit to expense and a credit to the Accrued Provision for Free Life Insurance account. The same account was simultaneously debited with an amount of $566,750, which amount corresponded with the total face amount of life insurance coverage under the policy for the 672 employees who retired during the period August 1, 1950, through December 31, 1951, and were still living on the latter date, as reflected in the certificates issued to them, and a corresponding credit was made to the Outstanding Liability for Free Life Insurance on Retired Employees account. In its income tax return for 1951 the petitioner did not take a deduction of the above-mentioned $1,457,266 but in lieu thereof took a deduction of $566,750 which, as heretofore stated, was disallowed by the respondent.

The petitioner's published financial statements, including its annual report to stockholders containing the report thereon of petitioner's independent public accountants, are prepared from and are in accordance with the petitioner's books.

### OPINION.

The primary issue in this case involves the question of the amount the petitioner, under the circumstances presented, was entitled to deduct for 1951 as an expense for life insurance on its insured employees following their retirement pursuant to petitioner's pen-

sion plan and who were living at the end of 1951. In its return for 1951 the petitioner deducted $566,750 representing the total face amount of life insurance coverage under the policy as reflected in certificates issued to its 672 employees who retired during the period August 1, 1950, through December 31, 1951. The respondent determined that no deduction was allowable to petitioner for insurance on the lives of retired employees other than the amount of premiums accrued during the taxable year 1951. Having allowed as a deduction the premiums billed by Aetna to petitioner for the year with respect to the policy, the respondent disallowed the deduction taken by petitioner. Although in its petition the petitioner assigned error as to the respondent's action, on brief it concedes that since $255,000 of the above-mentioned $566,750 was attributable to insurance with respect to the 290 employees who retired during the period August 1 through December 31, 1950, the portion of the $566,750 actually in controversy herein is $311,750, or the amount attributable to insurance with respect to the 382 employees who retired during 1951, the only taxable period involved in this case.

As we understand the position of the petitioner, it is as follows: That by reason of the union agreement respecting union employees and by reason of its undertaking with respect to nonunion employees the petitioner was obligated to provide its insured employees upon their retirement pursuant to its pension plan with "free life insurance for life" in fixed amounts of $1,000, $750, or $500 depending on whether at retirement an employee had 25, 20, or 10 years of credited service, respectively; that in connection with such obligation, the petitioner obtained group policy No. 40,400 providing insurance for both petitioner's union and nonunion employes during the time they were active and after their retirement and that by reason of the terms of the policy the necessary premiums paid on the policy were computed on Aetna's experience rating plan and consisted of the claims incurred by Aetna upon the death of active and of retired employees covered by the policy, the cost of conversion privileges exercised by employees, and Aetna's charge for services rendered or retention; that during 1951 the petitioner's liability to pay death benefits with respect to retired employees through the free life insurance program with Aetna and pursuant to the union agreement and the undertaking with nonunion employees became irrevocably fixed with respect to the 382 employees who retired during 1951 and the petitioner became unconditionally obligated to pay the sum of $311,750 with respect to said death benefits at some time subsequent to 1951, the time of payment being dependent upon the respective dates of death of the retired employees; and that accordingly the petitioner was

entitled to accrue and take a deduction for 1951 of the foregoing amount of $311,750 for "free life insurance for life" with respect to the 382 employees. As we see it the petitioner's position in substance is that upon the retirement pursuant to petitioner's pension plan of an employee insured under group policy No. 40,400, the petitioner thereupon incurred a fixed, unconditional, and irrevocable liability to pay with respect to the death of such employee the amount of $1,000, $750, or $500, depending on whether at retirement the employee had 25, 20, or 10 years of credited service, respectively. The respondent takes the position that the record not only fails to establish that the petitioner incurred such a liability upon the retirement of an employee but shows the contrary.

It is well settled that a taxpayer who keeps accounts and files income tax returns on an accrual basis may and should deduct from gross income a liability which in fact accrues in the taxable year. However, in order correctly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability, but this cannot be the case where the liability is contingent. *Dixie Pine Products Co.* v. *Commissioner*, 320 U.S. 516, affirming 45 B.T.A. 286; *Security Flour Mills Co.* v. *Commissioner*, 321 U.S. 281.

Group policy No. 40,400 was in all material respects identical in form and content with the form of "a new life policy" referred to in section 1(a) of article X of the union agreement and accordingly is to be considered as the intendment of the parties to the union agreement as to content and form of the policy. Section 1 (a) of article X of the union agreement provides that:

Said policy * * * when issued in substantially the form in which the parties have approved it, shall be determinative of the rights and obligations under this Article X, of employees, retired employees (as defined in Article IX of this agreement) the Union, and the Corporation.

Section 6 of article X provides that:

The Corporation shall be under no obligation by reason of this Article X except in good faith to endeavor to obtain the insurance herein described, and to pay its share of the premiums thereunder and to fulfill any obligations it undertakes in said policies.

The plural "policies" was used because article X related to other kinds of insurance as well as to life insurance.

By the foregoing provisions of section 6 of article X of the union agreement, the parties to the agreement have limited and restricted the petitioner's obligations with respect to the life insurance described in the article to (1) a good faith endeavor to obtain such insurance, (2) to pay its share of the premiums payable with respect to such insurance when obtained, and (3) to fulfill any

obligation undertaken by it in the policy issued with respect to such insurance. During 1950 the petitioner obtained group policy No. 40,400 which we have observed above is to be regarded as the intendment as to life insurance of the parties to the union agreement. Consequently, prior to the taxable year in controversy, the petitioner had discharged its obligation relating to obtaining the insurance. During 1950 and 1951 the petitioner paid its share of the monthly premiums determined and billed to it by Aetna pursuant to the terms of the policy. Consequently, to the end of the instant taxable year, the petitioner had discharged its obligation relating to the payment of premiums for those years. If there was any obligation, aside from what has been mentioned, which the petitioner undertook in the policy which it did not perform prior to the end of 1951, such obligation has not been pointed out to us nor have we been able to ascertain from the record what it was.

From our consideration of the provisions of the union agreement and of the policy, together with the remainder of the record, we are unable to find that the foregoing instruments imposed on petitioner upon the retirement of an employee, a fixed, unconditional, and irrevocable liability to pay with respect to the death of such employee any definite or currently ascertainable amount of money. It is true that under Aetna's experience rating plan, which was employed in computing the annual necessary premium on the policy, death claims arising from the death of insured retired employees were included in determining the annual necessary premium. But the same is true with respect to death claims arising from the death of active employees. It is our view that the intent and effect of the arrangement set up was to insure as a group the petitioner's eligible employees both active and retired and provide for the determination of the annual necessary premium on a basis which included death claims without distinction or segregation as to whether they arose from the death of persons actively employed or retired. In view of the limitations and restrictions contained in section 6 of article X of the union agreement as to petitioner's obligations with respect to the insurance in question, we fail to see how the fact that the annual necessary premium on such insurance was determined by a method which employed death claims can expand or increase petitioner's obligations so as to embrace the liability contended for herein by petitioner. The policy specifically provides that, instead of the method of computing premiums by Aetna's experience rating plan set out therein, premiums may be computed *by any method* which produces approximately the same total amount of premiums and is mutually agreeable to Aetna and the petitioner. In view of that provision we think it obvious that Aetna's premium charge

for the insurance provided would have been approximately the same if the premium had been computed by a method which did not employ the use of claims arising from the death of retired employees. Such being the situation we think it apparent that the parties to the union agreement and the policy, by adopting the use of Aetna's experience rating plan under which premiums were computed by the use, among other things, of claims arising from the death of insured employees, did not intend to and did not in fact impose on petitioner any additional obligation with respect to the insurance than those specifically provided for in section 6 of article X of the union agreement.

Aside from the foregoing, if it be conceded that for some reason the payments made were to be made with respect to the death of retired employees and to be regarded as "death benefits," as petitioner refers to them, which the petitioner was liable to pay, we think it would have to be concluded that such liability was contingent. If upon the death of an employee the policy was not in force, no amount would be payable with respect to such death. Under the policy Aetna had the right to cancel, lapse, or discontinue it when less than 75 per cent of petitioner's eligible active employees were insured under it. Therefore, continuance of the policy in force was contingent upon at least 75 per cent of petitioner's eligible active employees continuing to contribute the amount required of them with respect to the premium or, in the event less than 75 per cent continued to make such contribution, then upon the contingency of Aetna's continuing the policy in force anyway.

Furthermore, if it be conceded that the petitioner in 1951 incurred a liability to make payment of "death benefits" in subsequent years, the petitioner has not shown that all the events occurred in 1951 which would fix the amount of such liability at $311,750, the amount here in controversy or any other specific amount. Under the insurance arrangement petitioner's active insured employees were required to contribute with respect to their respective coverages under the policy the amount of 45 cents per month per $1,000 of insurance. The petitioner was not required to contribute any specific amount per month or per year per $1,000 of insurance on either its active insured employees or its retired employees. However, to the extent the total contributions of the active insured employees were insufficient to pay the necessary premium on the insurance coverage of both such active employees and the retired employees, the petitioner was obligated to contribute as its share of the premium such additional amount as was required to complete payment of the total necessary premium. In years when the

total contributions of the active insured employees equal or exceed the premium for the total insurance coverage for both active and retired employees, there is no share of the premium for the petitioner to pay, and petitioner is not obligated to make any contribution. In such years the cost of what the petitioner refers to as "death benefits" arising from the death of retired employees would not in fact be borne by petitioner but by its active insured employees.

The petitioner takes the position that it would be fallacious to conclude that under the insurance arrangement here involved there could be a year in which the petitioner would not be required to pay any share of the premium because the total contributions of active insured employees would be equal to or in excess of the premium for the year for the insurance coverage of both active and retired employees. In view of the following quoted provisions of the union agreement and the policy, it would appear that the parties to those instruments contemplated the occurrence of such situations.

Section 3(a) of article X of the union agreement provides as follows:

The Corporation [petitioner] will pay any increase of premium required on the Life Policy * * * during the term of this Article and shall receive and retain any dividends paid or credits, refunds or reimbursements under whatever name, made on the Life Policy * * *

The policy contains the following provisions respecting the treatment to be accorded the *excess* of employee contributions over the premium paid:

If the aggregate of employee contributions made under this policy in respect of any one policy year shall exceed the aggregate of premiums paid under this policy in respect of the same policy year (after giving effect to any experience credits allowed in respect of such policy year), such excess—less the amount obtained by deducting the aggregate of employee contributions made under this policy in respect of the two policy years preceding such policy year from the aggregate of premiums paid (after giving effect to any experience credits) under this policy in respect of the same two policy years—shall be applied by the Employer for the sole benefit of employees; but the Insurance Company shall not be obliged to see to the application of any such excess.

The petitioner urges that the foregoing quoted provisions of the policy merely expressed in the policy the treatment prescribed by the Michigan Insurance Commissioner to be accorded the excess of employee contributions over premiums paid and does not evidence that Aetna and the petitioner were of the view that a possibility of an excess existed. If such were the situation, the incorporation of the provisions in the policy would seem pointless. At any rate the provisions in question relate only to the amount of an excess of employee contributions over the premiums paid under the policy,

and not to the portion of the employee contributions which equal the premiums paid.

The respondent's action as to this issue is sustained.

Since we have decided the primary issue adversely to petitioner, it becomes necessary to consider an alternative issue raised by petitioner, namely, whether the petitioner was entitled to deduct for 1951 an amount of $1,457,266 as an accrued expense incurred in that year on account of a liability of the petitioner to provide "free life insurance for life" after their retirement to insured active employees who retire during the term or life of the union agreement. The primary issue relates only to petitioner's liability with respect to insurance coverage of employees who had actually retired by the end of 1951. Under the alternative issue, the petitioner contends that, in order to properly reflect its income under an accrual method of accounting, it is necessary for it to deduct in each year an actuarially determined amount as its liability with respect not only to its retired employees but also to its active employees who will become eligible for free life insurance upon retirement and that, for the period August 1, 1950, through December 31, 1951, it incurred a liability in the aggregate amount of $1,457,266 with respect to its active and retired employees. The $1,457,266 includes the $566,750 relating to insurance coverage of employees who retired during the period August 1, 1950, through December 31, 1951, and which was deducted by petitioner for 1951, disallowed by respondent, and considered above by us.

Such liability as the petitioner has with respect to insurance coverage of both active and retired employees arises from the union agreement and the policy which was issued pursuant thereto. Prior to retirement each insured employee is required to contribute to the payment of the premium on the policy a specified sum monthly per $1,000 of his insurance coverage and after retirement he is relieved from the payment of any premium on his coverage. As heretofore observed, the parties to the union agreement have limited the petitioner's liability for premiums on the policy to the payment of its share of the premiums. Under the arrangement the petitioner's share of the premiums is that amount, if any, by which the total premiums contributed by the active employees are insufficient to pay necessary premiums on the policy as determined by Aetna from year to year. Unless an employee retires under the petitioner's pension plan and is insured under the policy at the time of his retirement,( he is not entitled to insurance coverage of $1,000, $750, or $500 dependent on his service of 25, 20, or 10 years, respectively. Consequently, until an employee actually retires pursuant to the petitioner's pension plan and unless he also is insured

under the policy at the time of his retirement, it is apparent that all the events have not occurred which make the petitioner liable to pay any premiums for free life insurance as to that employee. Consequently, prior to an employee's retirement under such circumstances, the petitioner's liability for the payment for any free insurance as to that employee is at most only contingent. The fact that the petitioner employed an actuary to give his view as to the number or percentage of petitioner's employees who likely would be entitled to free life insurance upon retirement and the amount thereof, and his view as to the probable sum that would be necessary to pay the premiums on such insurance, cannot obviate the fact that prior to actual retirement of an employee under the required circumstances, the petitioner's liability for making payment of any premiums with respect to free insurance coverage of him was entirely contingent. A taxpayer may not accrue and deduct as an expense an amount his liability for the payment of which is contingent.

The crucial factor involved in petitioner's actuarial computation is of course the probability of actual retirement of an active employee under petitioner's retirement plan. All other factors being present with respect to the accruability of the amount here sought to be deducted, absence of an actual retirement would prevent the accrual of any liability. As we view the situation the likelihood or probability of actual retirement of any one of petitioner's active employees or a proportion of its total employees is so contingent as not to be a proper subject for actuarial computation. For instance, an employee's continued employment to retirement would necessarily depend upon at least his domestic situation which itself is affected by a myriad of contingencies. It would depend upon his seniority at the time of layoffs by his employer, the petitioner. It would depend upon the general economic welfare not only of petitioner but of the country as a whole. And last, but not least, it would depend upon the individual whim of the employee himself. The contingencies latent in any such computation are so many and varied as to relegate such a computation to the sphere of pure conjecture.

In view of the foregoing we are unable to find that the respondent erred in failing to allow the petitioner a deduction for 1951 of the $1,457,266 involved in this issue.

Since other adjustments made by respondent in determining the deficiency have been settled by agreement of the parties,

*Decision will be entered under Rule 50.*